IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN SECTION OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| ADRIAN DESHUN DELK,    ) | |
|    ) | **Case No.** |
| PLAINTIFF,    ) | |
|    ) | |
|    ) | |
|    ) | **COMPLAINT FOR VIOLATIONS OF** |
|    ) | **THE CIVIL RIGHTS ACT OF 1871, 42** |
| v.    ) | **U.S.C. § 1983, AND TENNESSEE** |
|    ) | **COMMON LAW** |
|    ) | |
|    ) | |
| CORECIVIC d/b/a "HARDEMAN    ) | |
| COUNTY CORRECTIONAL FACILITY,"    ) | **JURY TRIAL DEMANDED** |
| WARDEN GRADY PERRY, DANITA    ) | **PURSUANT TO FED. R. CIV. PRO. 38(a)** |
| WOODS, TOMICKA MCKINNIE,    ) | **& (b)** |
| COLUMBUS MALONE, and LATOYA    ) | |
| LOUDEN     | |
|     | |
| DEFENDANTS.     | |

## COMPLAINT

TO THE HONORABLE DISTRICT COURT JUDGE:

Plaintiff Adrian Deshun Delk ("Plaintiff"), by and through his designated attorneys, for

his Complaint alleges as follows:

### I.

### <u>NATURE OF THE ACTION</u>

1.   This suit is brought under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983

("Section 1983") and 1988 and Tennessee statutory and common law in order to remedy

Defendants actions in causing Plaintiff to be deprived of his constitutional rights under color of

law which were secured by the Eighth and Fourteenth Amendments of the United States

Constitution and narrowly tailored to address the issues of deliberate indifference to threats of harm, deliberate indifference to harm to Plaintiff, and deliberate indifference to Plaintiff's right to necessary medical care for severe medical conditions resulting from the multiple assaults which occurred due to Defendants' deliberate indifference which was so severe as to shock the conscience of the Court. These attacks and the resultant permanent medical conditions, exacerbated by wont of treatment, were the result of institutional failures endemic to CoreCivic facilities in general and Hardeman County Correctional Facility in particular. Plaintiff's own case demonstrates a pattern of deliberate indifference resultant from intentional understaffing and refusal of medical treatment in an effort to profit from their taxpayer-funded contracts with Tennessee without providing those constitutionally-mandated services for which Tennessee has paid them.

2.      In 2016, CoreCivic, Inc. was sued by its own shareholders[1] because, among other things, the company misrepresented staffing numbers, staffed significant numbers of underqualified individuals, and provided poor medical care and safety at their facilities, which led the Federal Bureau of Investigation ("FBI") to investigate, and ultimately, the Federal Bureau of Prisons to cancel its business relationship with CoreCivic.  CoreCivic and its corporate leaders have bolstered the company's profits by reducing staff levels and cutting medical care, despite being contractually obligated to provide minimum staff levels and adequate medical care to all prisoners.  CoreCivic, and its leaders, knowingly and intentionally tolerate assault and mayhem

---

[1] *See Nikki Bollinger Grae, individually and on Behalf of All Others Similarly Situation, v. Corrections Corporation of America, Tennessee, LLC, et al.*, Case No. 3:16-cv-02267. (According to Lead Plaintiff Nikki Bollinger Corrections Corporation of America (a/k/a CoreCivic) for years engaged in a scheme to defraud investors and made numerous materially false and misleading statements and omissions regarding CoreCivic's business and operations (D.E. 57, ¶ 3.) Ms. Grae further alleged that CoreCivc understaffing, and the use of underqualified staff directly attributed to multiple CoreCivic employee deaths and those instances of understaffing were far from isolated. (Id. at ¶ 4.) CoreCivic's attempts at cost savings and "efficiencies" from understaffing and hiring underqualified staff, directly contributed to serious safety and security issues at CoreCivic facilities. (Id. at ¶ 117).) On April 8, 2022, a substantial amount of the prior sealed documents in the class action were unsealed. (D.E. 494).

for the sake of higher profits.  They have concluded that it is more profitable to pay an occasional fine or settlement than to prevent assaults and grievous injuries. Furthermore, the company has repeatedly engaged in fraud and evidence tampering in order to conceal its systemic understaffing, contract violations, and employee misconduct. Notwithstanding these and numerous warnings, CoreCivic deliberately continued to provide inadequate staffing, training, supervision, and medical care at Hardeman County Correctional Facility, resulting in multiple assaults and grievous injuries sustained by Plaintiff Delk. CoreCivic is liable to Plaintiff Delk under 42 U.S.C. §§ 1983 and 1988 as well as state law theories of negligence and gross negligence.

## II.

### SUBJECT MATTER JURISDICTION AND VENUE

3.     This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) on the grounds that the claims asserted herein arise under Section 1983 and Section 1988. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) in that the federal claims substantially predominate over state law claims and the claims are so related that they form part of the same case or controversy.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), (b) and (c) on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

## III.

### THE PARTIES AND PERSONAL JURISDICTION

5.     Plaintiff Adrian Deshun Delk is a resident of Shelby County, Tennessee.  At all times material to this cause, Plaintiff was incarcerated at Hardeman County Correctional Facility

("HCCF"), located in Hardeman County, Tennessee.   HCCF is owned and operated by CoreCivic.

6.      Defendant CoreCivic, previously doing business as Corrections Corporation of America, ("CoreCivic"), is a private Real Estate Investment Trust which owns and operates HCCF[2], housing prisoners sentenced to confinement in the Department of Corrections.  As such, CoreCivic performs a public function traditionally reserved to the state and is therefore subject to suit under 42 U.S.C. § 1983.  CoreCivic is a corporation incorporated in the state of Delaware. Its principal office's location in the state of Tennessee is 10 Burton Hills Boulevard, Nashville, Tennessee 37215.  It can receive service of process through its registered agent, CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919. CoreCivic owed a duty to Plaintiff and breached that duty and is subject to liability in this case. At all times relevant to this Complaint, CoreCivic acted under color of law, performed government functions, was entwined in a symbiotic relationship with the Tennessee Department of Corrections, and was otherwise engaged in state action consistent with the Supreme Court's analysis in *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288 (2000). is a "person" within the meaning of 42 U.S.C. § 1983.

7.      Defendant Grady Perry ("Defendant Perry" or "Warden Perry"), upon information and belief, is a citizen and resident of Wayne County, Tennessee.  At all times material to this cause, Defendant Perry was employed by CoreCivic was the Warden of HCCF, and acted pursuant to the rules and regulations of the Tennessee Department of Corrections and policies of CoreCivic. Defendant Perry is an employee and agent of CoreCivic with policymaking authority and was ultimately responsible for the oversight and implementation of all policies at HCCF

---

[2] As used throughout this Complaint, HCCF refers to the facility and its operator, CoreCivic, and allegations made against HCCF should be construed as allegations against CoreCivic.

during all relevant times related to this matter. At all times material to this cause, Defendant Perry was acting under color of law. Defendant Perry is being sued in his individual capacity.

8. Defendant Correctional Officer ("C.O.") Columbus Malone ("Defendant Malone") upon information and belief, is a citizen of Tennessee and at all times material to this cause, Defendant Malone was employed by Defendant HCCF performing his duties as a C.O. or case manager and was acting under color of state law. He is being sued in his individual capacity.

9. Defendant C.O. Danita Woods ("Defendant Woods" or "Woods) upon information and belief, is a citizen of Tennessee and at all times material to this cause, Defendant Woods was employed by Defendant CoreCivic as a C.O. at HCCF and was acting within the scope of her employment and under color of state law when performing her duties as a correctional officer at HCCF. She is being sued in her individual capacity.

10. Defendant C.O. LaToya Louden ("Defendant Louden" or "Louden") upon information and belief, is a citizen of Tennessee and at all times material to this cause, Defendant Louden was employed by Defendant CoreCivic as a C.O. at HCCF and was acting within the scope of her employment and under color of state law when performing her duties as a correctional officer at HCCF. She is being sued in her individual capacity.

11. Defendant C.O. Tomicka McKinnie ("Defendant McKinnie" or "McKinnie") upon information and belief, is a citizen of Tennessee and at all times material to this cause, Defendant McKinnie was employed by Defendant CoreCivic as a C.O. at HCCF and was acting within the scope of her employment and under color of state law when performing her duties as a correctional officer at HCCF. She is being sued in his individual capacity.

12. This Court has both general and specific personal jurisdiction over Defendants

because each Defendant has had substantial and continuous contact with Tennessee.  As a result, this Court has personal jurisdiction over Defendants pursuant to TENN. CODE ANN. §§ 20-2-214(1) and (2) and (6) and 20-2-223(1), (3) and/or (4) on the grounds that the claims asserted against them arise from Plaintiff's transaction of business within Tennessee and on the grounds that they have committed a tortious act within Tennessee.  Furthermore, Defendants' contacts and actions were directed toward Tennessee and thus warrant the exercise of personal jurisdiction over it pursuant to TENN. CODE ANN. § 20-2-225(2).

## IV.

## <u>RELEVANT PRIOR PROCEDURAL HISTORY</u>

13.     On October 21, 2016, Plaintiff filed a federal *pro se* complaint alleging violations of his civil rights. *Adrian Delk v. Hardeman County Correctional Facility, et al.*, Case No. 1:16-cv-01275-JDT-cgc. (D.E. 1.) At that time, the lawsuit was assigned to the United States District Judge James D. Todd. (D.E. 12.)

14.     The original complaint concerned both allegations about an incident which occurred on March 4, 2016, and those related to his subsequent medical treatment at South Central Correctional Facility ("SCCF"). (D.E. 1.)

15.     On November 2, 2018, Plaintiff submitted a *pro se* amended complaint, covering additional incidents at HCCF. (D.E. 31.)

16.     On October 11, 2019, Judge Todd conducted a Prison Litigation Reform Act review and allowed some claims to move forward and ordered that the claims involving Plaintiff's medical care at SCCF be transferred to the United States District Court for the Middle District of Tennessee. (D.E. 35 at PageID 941.)

17.     On December 11, 2019, the remaining claims in the Western District were

reassigned to Judge Daniel Breen. (D.E. 58.)

18.    In December 2019, Plaintiff retained counsel. (*See* D.E. 53-55.)

19.    On February 17, 2019, Plaintiff moved for leave to amend Plaintiff's First Amended Complaint, which Defendants opposed. (D.E. 66.)

20.    Plaintiff's motion for leave to amend was granted, and Plaintiff filed his second amended complaint on June 4, 2020 (D.E. 95.)

21.    On September 21, 2021, Defendants CoreCivic, Perry, Malone, Woods, Louden, and McKinnie filed their joint Motion for Summary Judgment. (D.E. 145.)

22.    On March 25, 2022, Judge Breen granted Defendant's Joint Motion for Summary Judgment (D.E. 159) solely on the grounds that while incarcerated Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). (Id. at PageIDS 2177-98). Judge Breen expressly declined to reach the merits of Plaintiff's claims and dismissed them *without prejudice* on procedural grounds. (Id.) Subsequently, Judge Breen issued Judgement in the case, which again indicated that Plaintiff's claims were dismissed without prejudice. (D.E. 160.)

23.    Tenn. Code Ann. § 28-3-104(a)(3) provides a one-year statue of limitations for civil rights actions that controls where a federal statute does not have a statute of limitations. *Board of Regents v. Tomanio¸* 446 U.S. 478, 483-84 (1980). Each of Plaintiff's claims were originally brought within one year after his claims accrued. Tenn. Code Ann. § 28-1-105, known as Tennessee's "Savings Statute," requires that a second action be refiled within one year of a final judgment where the matter was dismissed without prejudice. Former prisoner's whose cases were dismissed for failure to meet the PLRA's exhaustion requirement are entitled to take advantage of Tennessee's Savings Statute and re-file suit. (*See Bales v. Little¸* No. 3:07-0495,

2008 U.S. Dist. LEXIS 76629, at *6 (M.D. Tenn. Aug. 28, 2008); *see also Cox v. Mayer¸* 332 F.3d 422, 427; *Younker v. Ohio State Univ. Med. Ctr.*, No. 2:11-cv-00749, 2013 U.S. Dist. LEXIS 88963, at *16 (S.D. Ohio June 25, 2013) (Plaintiff's complaint dismissed without prejudice for failure to exhaust administrative remedies. However, the court acknowledged that he was free to re-file his complaint without being subject to the PLRA's exhaustion requirements because he was no longer "confined in any jail").

24.     Plaintiff has been released and is no longer bound to the administrative exhaustion requirement of the PLRA. (*See Cox¸* 332 F.3d at 430 n.1; *see also Scheid v. Penrose*, No. 2:13-cv-1270, 2015 U.S. Dist. LEXIS 53522, at *4 (S.D. Ohio Apr. 23, 2015) (Holding that a plaintiff who was released from prison March 15, 2013, and filed a lawsuit December 27, 2013, was not subject to exhaustion requirements of the PLRA because "he was not incarcerated or detained at the time of filing."); *Rose v. Saginaw Cty.*, 232 F.R.D. 267 (E.D. Mich. 2005) (Finding that "the plain language of section 1997e(a) compels the conclusion that its requirements apply to prisoners who are confined when they file their lawsuits, and not to former inmates who bring actions after their release from custody.")

**V.**

**FACTUAL ALLEGATIONS**

25.     Plaintiff Adrian Delk is a 34-year-old who suffers from decreased vision, hearing impairment, numbness, memory loss, constant pain from nerve damage, and post-traumatic stress disorder ("PTSD"), which are the result of wounds sustained from multiple assaults while in the custody of CoreCivic at HCCF.

26.     During all relevant times to this action, Warden Perry failed to promulgate institutional policies and procedures that conformed to TDOC's policies. TDOC's promulgation

of TDOC Policy 506.14 placed CoreCivic and Warden Perry on notice that to release inmates housed in both tiers at the same time posed a significant risk of harm to inmates.

27.     TDOC policy 506.14 accurately sets out the standard of care in management of inmates in general population, and that standard of care requires the adherence to the Tier Management Supervision model at all times when medium or high security threat inmates are present.

28.     CoreCivic, Warden Perry, Defendant Woods, and the other Defendants breached the standard of care when they failed to implement policies and/or failed to comply with the Tier Management Supervision model when they released all members of both tiers from their cells/pods on March 4, 2016.

29.     Plaintiff reported the ongoing violence, threats, and extortion to CoreCivic corrections officers and supervisors, including but not limited to, the individual Defendants, and repeatedly requested transfer to safer locations.  As a direct and proximate result of CoreCivic's deliberate practice of understaffing its facilities, however, HCCF and Warden Perry did not provide sufficient staff to protect Plaintiff from violent gang members, even after it learned Plaintiff had been targeted. Furthermore, CoreCivic personnel refused to transfer Plaintiff to a safer location even upon learning of specific and direct threat's to Plaintiff's safety.

30.     Throughout January and February of 2016, Plaintiff repeatedly informed his Case Worker, Defendant Malone, that he was in physical danger as a result of being housed with Tremale Wilson ("Inmate Wilson").

31.     For example, on February 29, 2016, Plaintiff delivered to Defendant Malone the below cell-change request form in which Plaintiff requested a change to a safer cell, specifically informing Defendant Malone that Inmate Wilson had threatened him, that Inmate Wilson's

security points were too high to be housed with Plaintiff, that he feared for his safety, and that

Inmate Wilson had threatened him not merely personally but with gang violence:



32.     This Inmate Request Form even indicated that Plaintiff informed Defendant

Malone the previous week of his desire to be moved away from Inmate Wilson. Despite this

verbal and written requests which clearly placed Defendant Malone on notice of a threat of gang

violence, Plaintiff's requests were deliberately ignored, and no action was taken to ensure the

safety of Plaintiff, despite Defendant Malone possessing extensive knowledge of the threat of

harm posed by the "Crips" gang at HCCF.

33.     Inmate Wilson was a member of the Crips. Defendant Malone testified that it was

his belief that the Crips and the Vice Lords were the most powerful gangs in HCCF. (Dep. Tr. of

Defendant Malone, pp. 67:24 – 68:11.) This belief was based on his participation in weekly unit

team meetings where the gang violence which occurred at HCCF was briefed. (Id., pp. 68:12 –

69:11.) During 2015 and 2016, Defendant Malone participated in these weekly unit team

meetings. (Id., p. 69:8-10.) (A copy of the pertinent portions of Defendant Malone's deposition

transcript are attached hereto as **Exhibit 1.)**

34.     Inmate Wilson repeatedly threatened and bullied Plaintiff. Inmate Wilson routinely brought other members of his gang into the cell he shared with Plaintiff, and these individuals repeatedly threatened Plaintiff. Despite Plaintiff's numerous requests and notifications of the specific threats to his safety made to Defendant Malone, Plaintiff was left in the cell with Inmate Wilson.

35.     On March 4, 2016, Plaintiff again delivered to Defendant Malone another cell-change request form in which Plaintiff advised Malone that he was in fear for his safety because he was housed with a member of the Crips who had threatened him. He specifically requested the following:



36.     Defendant Malone admitted in his deposition that he interacted with Plaintiff on March 4, 2016, regarding issues with Plaintiff and his cellmate. (Dep. Tr. of Defendant Malone, pp. 55:24 – 56:4, 63:10-23, 64:5-11.) Despite this interaction, and HCCF's written policy requiring officers and case managers to take immediate action to protect an inmate after being notified of fear for their safety, Defendant Malone again took no action to ensure the safety of

Plaintiff.

37.     On, or about, March 4, 2016, at, or around 6:00 p.m., Defendants Perry and

Woods violated TDOC policy 506.14, by allowing all inmates of both tiers of the pod to be out

of their cells at the same time.  TDOC Policy 506.14(VI)(E) &(F) reads as follows:

> E. General population units/pods with a capacity to house 64 or more inmates who
> are medium or high security shall supervise in accordance with Policy #5046.01, and
> shall adhere to the Tier Management Supervision model at all times.  Inmates shall
> be allowed out of their cells for dayroom activities by tier/walk as determined by the
> institutional policy; **however, inmates housed on the upper and lower tier/walk
> shall not be allowed out of their cells for pod/dayroom activities at the same
> time.** (emphasis added)
>
> F. Each Warden shall promulgate the necessary institutional policy and procedures
> governing housing arrangements for inmates in accordance with this policy and
> incorporating the Tier Management Supervision for his/her facility.

38.     On, or about, March 4, 2016, at, or around 10:00 p.m., Plaintiff was nearly beaten

to death by seven (7) members of the Crips at the Hardeman County Correctional Facility for a

time period between 20 minutes and one hour. This entire incident was recorded by security

cameras in the Pod area.[3]

39.     At one point, Plaintiff was in possession of a copy of a copy of the videotape on

thumb drive to use in his complaint. However, CoreCivic employees subsequently seized and

removed from Plaintiff's possession this piece of key evidence.

40.     On, or about, March 4, 2016, at, or around 11:00 p.m., Plaintiff was discovered by

Inmate Marlon Randolph ("Inmate Randolph"). Inmate Randolph pushed the intercom button to

speak with Defendant Woods to inform her Plaintiff had significant head injuries, including

fractures, bleeding, and he was fading in and out of consciousness.  According to the sworn

---

[3] Despite a duty to preserve the surveillance footage of the assault triggered by both the criminal assault of Plaintiff and Plaintiff's filing of his *pro se* complaint alleging violations of his civil rights in Case No. 1:16-cv-01275-JDT-cgc. (D.E. 1) filed on October 21, 2016, Defendants spoliated the surveillance footage of this assault.

affidavit of Inmate Randolph, Defendant Woods responded, "Oh well."

41.     On, or about, March 4, 2016, at, or around 11:05 p.m., Inmate Randolph again pushed the button to speak with Defendant Woods to inform her Plaintiff was still bleeding and he might die.  Defendant Woods responded, "If you press the button again you will receive a disciplinary report." Defendant Woods took no further action.[4]

42.     On, or about, March 4, 2016, at, or around 11:30 p.m. Defendant Louden found Plaintiff in cell 214 with massive injuries, a significant head injury, fractures, lacerations, bruises, and covered in blood.  Instead of calling for medical assistance or providing medical aid, she told Plaintiff to go back to his cell.  Plaintiff informed Defendant Louden that one of his assailants was his cell mate.  Defendant Louden stated, "I don't care. Get in the cell with him so I can do count."

43.     Defendant Louden then forced Plaintiff into a cell with his assailant, deliberately placing his life in further harm.[5] These actions put Plaintiff in fear for his life and lasted approximately another 20 minutes. Plaintiff suffered severe psychological trauma as a result of being confined with his attacker as guards, including one or more of the individual Defendants, looked on and took no steps to ensure his safety or to provide medical care. Plaintiff reasonably believed that he might be killed.

44.     Despite being the victim of a vicious attack and having major physical injuries so severe that they could not be treated either on site or even in Hardeman or Fayette Counties, one

---

[4] Defendant Woods gave her deposition in the original action on May 28, 2021, in which she testified that she could not recall a single fact related to the March 4, 2016, assault on Plaintiff. (*See* Dep. Tr. of Defendant Woods, pp. 66:9 – 70:13.) A copy of the pertinent portions of her testimony are hereto attached as **Exhibit 2**.

[5] Defendant Louden gave her testimony in the original action on May 27, 2021, in which she testified that she did order Plaintiff back into his cell. (*See* Dep. Tr. of Defendant Louden, pp. 66:12–68:17.) She disputes that she saw his injuries at the time she instructed him back into his cell. A copy of the pertinent portions of her testimony are hereto attached as **Exhibit 3**.

or more Defendants forced Plaintiff to walk to the HCCF medical facility in restraints, which exacerbated Plaintiff's injuries to the point that Plaintiff succumbed to his injuries and passed out while waiting for a helicopter to evacuate him to Regional One in Memphis.

45. On March 5, 2016, Plaintiff was subsequently air lifted to Regional One Medical Center in Memphis, Tennessee, for a traumatic brain injury, bilateral mandible fractures (R angle and L body), left orbital floor fracture, among other injuries. At that time, he was diagnosed with permanent hearing loss and Tinnitus.

46. On March 9, 2016, Plaintiff was taken to the operating room with an Ear, Nose, and Throat specialist for open reduction and internal fixation/intermaxillomandibular fixation of bilateral mandible fractures and left orbital floor fracture. His jaw was wired shut, he was placed on a liquid diet, and was directed to have wire-cutters within immediate distance in case of emergency. Physicians prescribed Plaintiff 10 days' worth of clindamycin, Peridex mouthwash, a Medrol Dosepak, as well as pain medication. Additionally, a follow up was requested for March 21, 2016, with ENT specialists and Ophthalmology as scheduled. Plaintiff was discharged in a wheelchair.

47. Plaintiff was not authorized wire-cutters by Defendants and Defendants failed to have wire-cutters reasonably available for use on Plaintiff in the event of an emergency. On multiple occasions Plaintiff had to swallow his own vomit, nearly choking and dying.

48. One such occasion was March 10, 2016, when Plaintiff was transported back to HCCF by Sergeant Pirtel and Sergeant Clark, both HCCF employees. Plaintiff was purposefully not restrained in the transport vehicle and hit his head, breaking his stitches and causing blood to pour down Plaintiff's throat. This in turn caused Plaintiff to vomit in his own mouth and forced him to choke on a mixture of his own blood and vomit until he could manage to swallow the

rancid mixture.

49.     On March 10, 2016, a few hours after arriving back at HCCF, Plaintiff was

transported to another CoreCivic facility, SCCF.  Again, Plaintiff began to vomit in his own

mouth where he was forced to choke on a mixture of his own blood and vomit until he could,

again, manage to swallow the rancid mixture.  Plaintiff was placed in the infirmary at SCCF and

remained there over three months until he was released to HCCF, or around, July 28, 2016.

50.     On, or about, June 28, 2016, Defendant was released from the infirmary at SCCF

and was transported back to HCCF.

51.     On, or about, June 28, 2016, Plaintiff's first day back at HCCF, despite knowing

of the extreme risk of placing Plaintiff with a member of the Crips since no less than February

2016, Defendants breached the standard of care in a correctional setting and placed Plaintiff in

the same cell with a known Crip, Darius Lomax ("Inmate Lomax").

52.     On that same day Inmate Lomax submitted a cell-change request form in which he

stated the following:

CELL CHANGE REQUEST FORM

ALL information must be filled out completely before any cell change will be approved.

DATE: 2/28/16    TIME: 4:49

NAME: Darius Lomax _____ DOC # 426238 ___ SECURITY CLASS:

I request to move from: K-B-103 ___ to J-E 102 _____ Specific reasons for

requesting move: Cant cell with Delk do to crips jumping him

I do not feel safe sleeping round him. 3-4-16

Im a crip

53.     Between June 12, 2016, and October 21, 2016, Plaintiff filed over 20 sick call

request forms for basic medical care and/or complications that arose from the brutal assault he

suffered on March 4, 2016.   Plaintiff documented his own hearing and vision loss as his Traumatic Brain Injury was left untreated.  On his August 26, 2016, sick call form, Plaintiff even annotated that he has turned in ten (10) sick call forms without any response from HCCF. Plaintiff begged for medical assistance that never came because CoreCivic and HCCF wanted to keep costs low. These institutional failures form a pattern of deliberate indifference demonstrating CoreCivic's commitment to earning profits at the expense of its constitutional and contractual obligations.

54.     CoreCivic routinely understaffs its facilities and has filed fraudulent staffing reports with TDOC. As a result, CoreCivic has paid TDOC millions in liquidated damages but still refuses to raise wages to hire sufficient staff.

55.     On, or about, June 8, 2016, Plaintiff filed a five (5) page in-depth grievance with the Tennessee Department of Correction.  The grievance was subsequently summarized by the chairman as follows on June 29, 2016: "Claims that due to failure to operate the tier management he was assaulted and almost murdered."  The Chairman, HCCF employee, S Jones asserted that the grievance inappropriate solely on the basis it addressed multiple issues and used that as a basis to deny the substantive aspects of the grievance. To the extent that CoreCivic policies permit or require their employees to ignore complaints of major deviations from Eighth Amendment standards because of form rather than substance, CoreCivic's policies directly promote deliberate indifference to such claims and are the direct and proximate cause of Plaintiff's injuries. Defendant Perry, subsequently agreed with the Chairman's decision on July 7, 2016. His awareness of the grievance and endorsement of the outcome on solely procedural grounds constitutes acquiescence and ratification of Jones' decision and renders him liable for Jones' actions.

56.     On October 21, 2016, Plaintiff filed a *pro se* Complaint for Violations of Civil Rights under 42 U.S.C. §1983.

57.     After Plaintiff's *pro se* lawsuit was filed, Plaintiff was repeatedly assaulted, threatened, and extorted by prison gang members at HCCF.  Plaintiff continued to report the ongoing violence and extortion to CoreCivic supervisors, and repeatedly requested transfer to safer locations.  As a result of CoreCivic's deliberate practice of understaffing its facilities, however, HCCF still could not provide sufficient guard staff to protect Plaintiff from violent gang members, even after it had actual knowledge of the violent attacks against Plaintiff. Furthermore, CoreCivic personnel still refused to transfer Plaintiff to a safer location.

58.     On, or about, January 3, 2017, after dozens of ignored sick call slips, Plaintiff filed a four (4) page Inmate Grievance which detailed his injuries and their causes as well as his need to see a physician.

59.      On Exhibit pages one (1) and two (2) of the aforementioned grievance, Plaintiff drew a fully functioning eye and provided a one-and-a-half-page summary of what underlying injury he believed was causing his eyesight loss. On page three (3) of the grievance, Plaintiff drew a fully functioning jawbone and described for another page, what serious medical condition he believed was causing his un-resolved pain.

60.     On June 8, 2017, four (4) inmates in F-Unit cell 214 assaulted Plaintiff.  These inmates were also Crips. Subsequently, Plaintiff informed C.O. Dorthy Robertson, the F-Unit Manager, that he did not feel safe in F-Unit and wanted to be transferred to another unit.

61.     On June 9, 2017, Plaintiff mailed the following letter to Kelsey Gates, an Internal Affairs employee of HCCF, begging to be moved to safer housing and away from gang members that were targeting him:.

To: _Kelsey  Gates_ , **Hardeman County Correction Facility**
employee. Time: _10:08_   and Date: _6-9-17_ Title:**[Emergency]**

This letter is to inform you that I, was assaulted again by Crips with in F-D POD on 6-8-2017 at 7:40- 8:40 am due to turning in legal mail at 7:30am in the F-D port to mail-room employee Kelly. I, wish to be placed in a safer housing unit were I will not have to encounter any gang attacks. I, have sent many letters hand written to staff on request forms. These letters have gone unanswered for some strange reason. I'm housed within F-D pod which has at lease 15 Crips within the pod housed on top and bottom tier.

This letter will have a witness signed showing that I'm dropping it in the facility hallway mail box were the request forms go. I, also if its possible I, would like to talk to a Hardeman County Sheriff Office police officer. I,have sent letters out to theses government offices. I'm worried that my mail is not leaving the Hardeman County Correctional Facility, I, have also filed TDOC grievances about my mail issue which the legal mail.

I, hope to get a response form an employees soon the case worker will not speak to me nor move me for this dangerous pod.

_John B. Kelly_ ___ On Hallway HL & I walk,
Name of Witness to letter being drop in H.C.C.F box

Plaintiff's pleas and requests continued to go completely unanswered.  This was one of three letters sent to Defendant Gates.

62.     On, or about, November 3, 2017, CoreCivic employees at HCCF placed Tradarious Perry ("Inmate Perry"), a known Blood gang member and former Crip, who was also a known affiliate of Inmate Wilson, one of the Plaintiff's original gang member assailants. Inmate Perry immediately began threatening to kill Plaintiff.

63.     Subsequently on, or about, November 3, 2017, Plaintiff and Inmate Vincent Kelly ("Inmate Kelly") spoke to C.O. Inell Allen ("C.O. Allen") to inform her Plaintiff's life was in

18

danger due to the threats of Inmate Perry. This meeting occurred in C.O. Allen's office. Plaintiff provided C.O. Allen with a cell change request form. Instead of simply remedying the problem and protecting Plaintiff from yet another assault, C.O. Allen continued the long pattern of institutional failures threatened both Plaintiff and Inmate Kelly with punitive measures. C.O. Allen's conduct continued the pattern of deliberate indifference to Plaintiff's safety.

64.     On, or about, November 4, 2017, Plaintiff woke to Inmate Perry stabbing him with a large knife.  Plaintiff was stabbed no less than five (5) times. His suffered lacerations to his head, throat, and body.  Plaintiff was rushed to Jackson General Hospital. Plaintiff suffers PTSD and permanent back problems due to this assault that but for the deliberate indifference of HCCF Plaintiff would not have suffered.

65.     On, or about, November 14, 2017, Defendant Robertson conducted and completed an investigation of the November 4, 2017, assault with a deadly weapon on Plaintiff.  Defendant Robertson found that Inmate Perry "stuck" (sic) inmate Delk with an undefined object. Upon information, and belief, Inmate Perry was subsequently charged with assault with a weapon.

66.     Defendant McKinnie, the Protective Custody Case Manager, was aware of all of the prior attacks against Plaintiff and that said attacks were the result of gang vendettas against him. Plaintiff specifically informed Defendant McKinnie that he would be attacked if housed with another member of either the Crips or Bloods gangs.

67.     Despite these warnings, on, or about, January 17, 2018, Defendant McKinnie moved Plaintiff into Protective Custody with Inmate Cleophus Craft ("Inmate Craft"), who was a known member of the same gang as Inmate Perry.  Defendant McKinnie's actions in housing Plaintiff with Inmate Craft were deliberate, and Defendant McKinnie knew or should have reasonably anticipated that Plaintiff would be attacked if housed with Inmate Craft.

68.    On, or about, January 3, 2018, while C.O. Carlson was conducting rounds in segregation, Plaintiff approached C.O. Carlson to ensure he was not being released into the compound. He advised C.O. Carlson that he did not feel safe to leave segregation due to previous assault and that he feared for his life. C.O. Carlson prepared a report of the incident and filed a report on January 5, 2018.  That incident report reads as follows:

```
' LIBJ                         INCIDENTS              DATE: 01/05/18
  BR21AFN                INCIDENT DESCRIPTION          TIME: 06:35 AM

' Incident ID: 01309240
     Site ID:  HCCF    HARDEMAN COUNTY CORRECTIONAL FACILITY

      Incident Date: 01/03/2018      Incident Time: 01:00 AM
  Description:
     ON 1/3/18 AT APPROXIMATELY 0100 HOURS, I SENIOR CORRECTIONAL OFFICER
     B. CARLSON WAS CONDUCTING ROUNDS IN SEG WHEN INMATE DELK, ADRIAN
     #532927 IN SEG CELL #13 SAID HE WANTED TO HOLLER AT ME.  INMATE DELK
     ASKED IF HE WAS STILL BEING RELEASED TO THE COMPOUND.  I ADVISED HIM
     THAT HE WAS BEING RELEASED BY DAY SHIFT TO ID POD.  I/M DELK ADVISED
     THAT HE DID NOT FEEL SAFE TO LEAVE SEG FOR THE COMPOUND DUE TO
     PREVIOUS I/M ASSAULTS ON HIM AND FEARED FOR HIS LIFE.  HE ADVISED HE
     WOULD TAKE AN

  Reported by Staff ID:  CARLBRO1  CARLSON, BRENT
  Prepared by Staff ID:  CARLBRO1  Date: 01/03/2018
```

69.    At all relevant times during 2018, C.O. Carlson's report was accessible to and should have been reviewed by Defendant McKinnie as she was the Unit Manager overseeing C.O. Carlson. Defendant McKinnie had actual knowledge of the threat posed to Plaintiff by Inmate Craft.  Defendant McKinnie also had the authority to either take direct action to remedy the danger to Plaintiff's safety and/or the duty and the ability to report the risk to Plaintiff's safety to a supervisor who had the authority to directly intervene to protect Plaintiff. Despite knowledge of this report, Defendant McKinnie took no action.

70.    On, or about, January 18, 2018, after receiving a report of a creditable threat against Plaintiff's life, while in Protective Custody, Inmate Craft predictably attacked Plaintiff causing him serious bodily injury.  Plaintiff was attacked for the fourth time in less than ten (10) months.

20

71.     Plaintiff's injuries are part of a pattern of institutional failures.  On May 28, 2021, in Case No. 1:16-cv-01275-JDT-cgc Plaintiff disclosed Tim Gravette (hereinafter "Mr. Gravette") as his correctional expert. (D.E.. 137.) Mr. Gravette is a twenty-year corrections veteran. Nine of those twenty years were as an Associate Warden with the Federal Bureau of Prisons. Mr. Gravette's career assignments include the following: (1) Correctional Officer at the Federal Correctional Institution in Talladega, Alabama from June 1990 until October 1993; (2) Lieutenant at the Federal Detention Center and the Metropolitan Correctional Center in Miami, Florida; and (3) Lieutenant at the Federal Correctional Institution in Estill, South Carolina; (4) Captain at the Federal Detention Center in Oakdale, Louisiana; (4) Captain at the Federal Correctional Institution in Edgefield, South Carolina;  (5) Associate Warden at the Federal Correctional Institution Talladega, Alabama; (5) Associate Warden at the Federal Correctional Complex in Beaumont, Texas; (6) Associate Warden at the Federal Correctional Institution in Three Rivers, Texas. (D.E. No. 137-1, PageID 1395). Mr. Gravette has supplied an expert report (D.E. No. 137-1) and subsequently filed a rebuttal/supplemental report (D.E. No. 139-1) following his review of Defendants' expert Dr. John G. Peter's expert report.

72.     Mr. Gravette has opined that customs and practices existed at HCCF of violating the Tier Management Supervision model and failing to protect inmates (D.E. No. 137-1, 139-1). Of note, Mr. Gravette reviewed a list of lawsuits against CoreCivic in relation to this case and found that of the one-hundred eighty-six (186) lawsuits against CoreCivic, thirty-five (35) were for failure to protect. (D.E. No. 137-1, PageID 1400).

73.     Mr. Gravette makes clear that this is a case about the customs, practices, or actual implemented policies of CoreCivic and/or Warden Perry, including but not limited to, their deliberate and systematic understaffing, failures to implement policies or practices to curtail the

known problem of gang control, deliberate practice or custom of failing to abide by the Tier Management Supervision model, CoreCivic's failure to properly train and/or supervise subordinates, and CoreCivic's failure to protect Plaintiff. (D.E. 139-1, PageID 1417.) Mr. Gravette ties these customs and policies directly to the four separate assaults on Plaintiff.

74.     Plaintiff has alleged, and the evidence strongly supports a finding that CoreCivic has established policies or well-established customs that directly and proximately caused the deprivation of Plaintiff's constitutional rights including, but not limited to, deliberate and systematic understaffing at HCCF, deliberate and/or reckless failure to promulgate or implement the Tier Management Supervision model as directed by the Tennessee Department of Corrections, the deliberate and systematic failure to provide appropriate safe housing to Plaintiff and other inmates, and the deliberate and systematic failure to implement policies and procedures designed to curtail known problems of gang control over HCCF.

75.     CoreCivic also used a hyper-technical interpretation of its grievance procedures to prevent Plaintiff from accessing medical care or protection from his various assailants. CoreCivic permits only one issue to be addressed per grievance, does not permit more than one grievance to be pending at the same time, and requires that grievances be filed within a limited timeframe forcing inmates whose rights have been violated in more than one way to select which constitutional right they wish to enforce.

76.     The State of Tennessee conducts periodic audits of the Department of Corrections pursuant to the Tennessee Governmental Entity Review Law, Tennessee Code Annotated § 4-29-111. The report produced is intended to aid the Joint Government Operations Committee in its review to determine whether the department should be continued, restructured, or terminated. The November 2017 Comptroller Report (hereinafter "The 2017 Report") covered activities for

the period July 1, 2014, through August 31, 2017, and included a review of internal controls and compliance with laws, regulations, and provisions of contracts.[6] Some pertinent findings are as follows:

**Performance Audit**
**Department of Correction**
November 2017

_____

**FINDINGS**

**Trousdale Turner Correctional Center and Whiteville Correctional Facility, managed by Core Civic, operated with fewer than approved correctional officer staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and one left critical posts unstaffed**
Shortages in correctional officer staff may have prevented two Core Civic facilities (Trousdale Turner Correctional Center and Whiteville Correctional Facility) from meeting staffing obligations and may have limited their ability to effectively manage the inmate populations assigned to them. Correctional officer staffing was often less than operationally planned, and Trousdale Turner had unstaffed critical posts on several days. Both facilities had rosters that did not match state-approved staffing patterns, and both facilities were consistently short-staffed (page 7).

**Core Civic staffing reports for two facilities (Trousdale Turner Correctional Center and Hardeman County Correctional Center) contained numerous errors, so information about hires, terminations, and vacancies may not be reliable**
Our review of staffing reports revealed inconsistencies regarding hires, terminations, and vacancies for two of the four Core Civic facilities. We found the following reporting issues for Trousdale Turner Correctional Center and Hardeman County Correctional Center: missing position numbers for vacancies; vacancies carrying over to subsequent months without additional vacant days; vacancies listed with more than 30 days not listed for the previous month; different job titles with the same position number; the number of hires and terminations not reconciling to the number of vacancies; and reports missing the number of filled positions, inmate population, and officer-to-inmate ratio (page 15).

**Trousdale Turner Correctional Center management's continued noncompliance with contract requirements and department policies challenges the department's ability to effectively monitor the private prison**
After nearly two years in operation, Trousdale Turner Correctional Center still did not comply with some of the Department of Correction's policies and contract requirements. While the department's contract monitoring efforts regularly report the facility's shortcomings, cuts in monitoring staff may have reduced the department's ability to effectively monitor key contract

(The 2017 Report, pg. iv).

77.     The January 2020 Comptroller Report (hereinafter "The 2020 Report") covered

---

[6] https://www.capitol.tn.gov/Archives/Joint/committees/gov-opps/jud/Department%20of%20Correction%20Performance%20Audit.pdf

activities for the period October 1, 2017, through July 31, 2019.[7] The 2020 Report was reviewed

by Mr. Gravette in forming his opinions regarding CoreCivic's custom of systematic

understaffing. (D.E. 137-1, PageID 1411). HCCF continued to inadequately staff, which had an

adverse impact on safety and security of inmates:

> ### Correctional Staffing and Department Turnover
>
> **Management must continue efforts to ensure adequate staffing at state and CoreCivic correctional facilities in order to provide safe and secure facilities for inmates and staff.**
> Sufficient staffing of correctional officer positions is vital to achieving the mission of the Department of Correction; however, both state- and CoreCivic-managed facilities have experienced significant difficulties in hiring and retaining a sufficient number of correctional officers. Due to minimal staffing levels at both state and CoreCivic entities, management has increased overtime and temporarily closed noncritical posts to cover critical posts and duties. At the facilities we visited, we found that, on average, they operated with fewer than the approved number of correctional officers while noncritical posts, such as transportation and recreation, were consistently under-staffed or closed. Low staffing levels coupled with frequent overtime impacts management's ability to provide safe and secure facilities, especially in emergencies. See **Observation 6** on page 130 and **Observation 7** on page 133.
>
> **The department should continue its efforts to remedy the deficiencies on CoreCivic's staffing reports as noted in the prior audit.**
> Despite management's stated corrective action after the November 2017 performance audit and efforts to accurately track staffing positions on a monthly basis, CoreCivic facilities' monthly staffing reports contained the same errors noted in the prior audit, so department management cannot effectively track whether CoreCivic is meeting its contractually required staffing levels. See **Finding 14** on page 135.

(The 2020 Report, pg. viii).

78.     The 2020 Report identified low staffing levels coupled with frequent overtime as

limiting CoreCivic's ability to provide safe and secure facilities, especially in emergencies. (*Id.*)

79.     The 2020 Report also found that HCCF, failed to accurately report inmate deaths,

assaults, violence, and inmate injuries. (*Id.* at vi). This practice of failing to provide accurate and

complete information regarding gang related violence prevented decision makers from taking

appropriate steps to curtail gang violence. (*See Id.*) TDOC found that CoreCivic staff failed to

---

[7] https://www.capitol.tn.gov/Archives/Joint/committees/gov-
opps/jud/Department%20of%20Correction%20Audit%20Report%20January%202020.pdf

keep accident/injury records that should have alerted management to a lack of security. (*Id.* at 40).

80.     Looking only at the evidence surrounding gang violence targeted at Plaintiff, he was assaulted four times by known gang members while HCCF staff failed to take action to protect him. Plaintiff requested safe housing in writing and verbally in the presence of multiple witnesses throughout his incarceration. The failure of staff to act when Plaintiff made these requests indicates pervasive indifference to safety and of inmates in HCCF's care including Plaintiff. (*See e.g.,* D.E. No. 137-1, 139-1)

81.     As troubling as HCCF employees' failures to properly document inmate deaths, assaults, violence, and injuries were, the 2020 Report's findings also indicate that HCCF, failed to properly retain, maintain, and rather improperly destroyed public records, which clearly have bearing on Plaintiff's allegations that Defendants' records are incomplete. The 2020 Report made the following findings:

---

**Public Records Management**

**Department of Correction management did not ensure that both department and CoreCivic staff complied with public records regulations, resulting in lost records as well as potential evidence.**

Public records provide evidence of government operations and hold government officials accountable for their actions. For the department and its CoreCivic contractor, such records are also vital to review the effective operation of correctional facilities and community oversight and may even serve as potential evidence in investigations. Based on our review, we determined the following:

- At four of six correctional facilities, state and CoreCivic management did not properly retain, maintain, and destroy public records.
- At three of six correctional facilities, state and CoreCivic staff disposed of large volumes of files without submitting the state-required certificates of destruction.
- One state correctional facility did not maintain security footage for the department-established minimum of 90 days, sometimes overwriting footage within 2 weeks of recording.

For more information, see **Finding 18** on page 195. Additionally, staff at one state facility did not follow the department's procedure for restoring public records after a minor flood destroyed some Fire and Safety records in spring 2019 (see **Observation 13** on page 198).

---

(The 2020 Report, pg. x).

**Table 46**
**Results of Public Records Review**

| Issue | Correctional Facility* | | | |
|---|---|---|---|---|
| | Hardeman | Whiteville | Northeast | Northwest |
| Outdated RDAs | X | X | X | X |
| Destroying records without approved certificates of destruction | X | X | | X |
| Insufficient record inventories | X | X | | X |

*The Hardeman and Whiteville correctional facilities are operated by CoreCivic, while Northeast and Northwest are operated by the Department of Correction.

(*Id.* at 196).

82.     The deposition testimony of various CoreCivic personnel indicates that there was a pattern or custom of policy violations including not utilizing the Tier Management Supervision as required by Policy #506.01. (D.E. No. 139-1, PageID 1418; *see e.g.*, Dep. Tr. of Defendant Woods, 46:13-16.)

83.     CoreCivic acted with deliberate indifference and failed to properly train and/or supervise their subordinates with respect to their responsibilities in ensuring that they provide a safe environment as evidenced by the countless gang attacks on Plaintiff and the needless denials of Plaintiff's legitimate requests for a cell change or protective custody. (*See e.g.*, D.E. 137-1, PageID 1397.) CoreCivic also failed to train or supervise its employees to accurately report inmate deaths, assaults, violence, and inmate injuries which resulted in the custom or practice of failing to provide accurate and complete information regarding gang related violence prevented decision makers from taking appropriate steps to curtail gang violence. (The 2020 Report. at vi). CoreCivic's Tennessee facilities routinely ignore basic inmate civil rights. For example, at Trousdale Turner Correctional Facility CoreCivic implemented a ban on the Quaran and free religious exercise, engages in the same understaffing that it does at HCCF, and has presided over a pattern of inmate-on-inmate attacks resulting in an egregious number of deaths over the last several years.

26

84.     Outside of Tennessee CoreCivic's actions are no better. According to a 2011 lawsuit filed by the American Civil Liberties Union, for example, understaffing by CoreCivic at their Idaho Facility led to such a violent atmosphere that CoreCivic settled the lawsuit and agreed to provide minimum staff levels. CoreCivic was subsequently held in contempt of court in 2013 for violating the agreement and falsifying records to misrepresent the number of guards on duty.  In 2014, the FBI opened an investigation of the company based on its billing for "ghost employees."  The Governor of Idaho, Butch Otter, ordered state officials to take control of the prison, and the company had to pay the state $1 million for understaffing.

85.     On, or about, February 23, 2017, a federal jury found that CoreCivic had violated inmates' Eighth Amendment rights to be free from cruel and unusual punishment by being deliberately indifferent to the serious risk posed by the company's long-standing practice of understaffing the Idaho Correction Center.

86.     At the Oklahoma prison operated by CoreCivic, ten prisoners were involved in a fight on February 25, 2015, that left five with stab wounds. The following month, eight more were involved in another stabbing incident. In June of that year, thirty-three gang members fought with weapons and eleven prisons were sent to a hospital. On September 12, 2015, four inmates were killed during a riot at the same facility. Inmates alleged that gangs were effectively allowed to run the prisons. According to an investigation by the Oklahoma Department of Corrections, video evidence of the September 12, 2015, incident from three cameras at the facility were recorded over or deleted by CoreCivic employees. Two guards were later indicted for brining drugs and other contraband into the prison, including one of the guards accused of failing to act during the riot. Between 2012 and 2016, one-third of all homicide in Oklahoma prisons occurred at two CoreCivic facilities, though they held just over 10 percent of the state's

prison population.

87.     In August of 2016, the Office of the Inspector General ("OIG") of the U.S. Department of Justice found widespread deficiencies in staffing and medical care at facilities operated for the Federal Bureau of Prisons by private contractors, including those operated by CoreCivic.[8] As a result, the Department of Justice indicated that it would phase out its relationships with private prisons.  That, in turn, led to the shareholder lawsuit described above. In a separate report released on April 25, 2017, OIG found understaffing at a detention facility in Leavenworth, Kansas operated by CoreCivic for the U.S. Marshall Service, with vacancy levels reaching as high as 23 percent between 2014 and 2015. Earlier the company tried to hide the fact that it was packing three inmates into two-inmate cells at Leavenworth, contrary to prison regulations.  The following excerpt appears in the April 25, 2017 OIG report:

> In 2011, without the knowledge of the [U.S. Marshals Service], the [Leavenworth Detention Center or "LDC"] took steps to conceal its practice of triple bunking detainees.  LDC staff uninstalled the third beds bolted to the floor of several cells designed for two detainees and removed the beds from the facility in advance of a 2011 America Correctional Association (ACA) accreditation audit. A subsequent CoreCivic internal investigation revealed that this may have also occurred during other ACA audits of the LDC.

Plaintiff restates the foregoing allegations as his own.

88.     In May of 2012, a riot at a federal prison operated by CoreCivic in Natchez, Mississippi resulted in the death of a guard and injuries to approximately 20 inmates and prison staff.  OIG investigated and alleged the following in a report released in December of 2016:

> The riot, according to a Federal Bureau of Investigation (FBI) affidavit, was a consequence of what inmates perceived to be inadequate medical care, substandard food, and disrespectful staff members.  A BOP after-action report found deficiencies in staffing levels, staff experience, communication between staff and inmates, and CoreCivic's intelligence system.  The report specifically cited the lack of Spanish-

---

[8] A summary of the report and findings was captured in a video published by the Department of Justice. Multimedia (justice.gov), p. 14, video dated Aug. 11, 2016.

speaking staff and staff inexperience.

For years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correction and health services and Spanish-speaking staffing. In 19 of the 38 months following the riot, we found CoreCivic staffed correctional services at an even lower levels than at the time of the riot in terms of actual post coverage.  Yet CoreCivic's monthly reports to the BOP, which were based on simple headcounts, showed that correctional staffing levels had improved in 36 of those 38 months.

Plaintiff restates the foregoing allegations as his own.

89.     On December 12, 2017, a former guard at Trousdale Turner testified before a legislative committee that she resigned from the company in September after witnessing two inmates die from medical neglect during the seven months that she worked for the company. Ashley Dixon told lawmakers that in one instance she pleaded with her superiors for three days to help a dying inmate, but to no avail, and her subsequent complaints were ignored by company officials.

90.     The foregoing incidents are some, but not even remotely all, of the incidents that demonstrate that CoreCivic, its wardens, and its employees adopt and enforce a corporate policy or well-established custom of understaffing and denying medical care to inmates, all for the purpose of increasing profits, and notwithstanding that such practices led to assaults, deaths, murders, and mayhem.  The multiple assaults of Plaintiff were predictable consequences of this corporate policy promoted by CoreCivic

91.     Defendant CoreCivic, Defendant Perry, and all other Defendant employees of CoreCivic, knew that understaffing, medical neglect, and inadequate training were rampant at the Facility, and did not make reasonable efforts to counteract the threats to inmate safety or provide adequate, necessary medical care.

92.     One or more Defendants were also aware that prison gangs essentially controlled HCCF or significant portions thereof. Despite being on notice of same, these Defendants failed

to take reasonable efforts to reduce the control of the gangs over the prison, such as increasing staffing levels, briefing and training guards on controlling gang activities, segregating gang members from each other, preventing communication between and among gang members, or taking other necessary and reasonable steps to minimize the control of prison gangs on HCCF.

**VI.**
**CAUSES OF ACTION**

**COUNT 1 – VIOLATION OF 42 U.S.C. § 1983 (AGAINST DEFENDANT CORECIVIC)**

93.     Plaintiff incorporates paragraphs 1 through 92 as if fully set forth in this Count.

94.     As alleged above CoreCivic, acting under color of state law and with deliberate indifference, violated the rights of Plaintiff secured by the Eighth and Fourteenth Amendments of the U.S. Constitution.

95.     At all times relevant to this Complaint, Defendant CoreCivic acted under color of law, performed government functions, was entwined in a symbiotic relationship with the Tennessee Department of Corrections and was otherwise engaged in state action consistent with the Supreme Court's analysis in *Brentwood Acad. V. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288 (2000). CoreCivic is a "person" within the meaning of 42 U.S.C. § 1983.

96.     Defendant CoreCivic acted with deliberate indifference, directly participated in and proximately caused the above described constitutional rights violations by establishing policies or well-established customs that directly and proximately caused the deprivation of Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments to the United States Constitution including, but not limited to, the deliberate and systematic understaffing of HCCF, the deliberate and/or reckless failure to promulgate or implement the Tier Management Supervision model as directed by the Tennessee Department of Corrections, the deliberate and systematic failure to provide medical care to Plaintiff and other inmates, and the deliberate and

systematic failure to implement policies and procedures designed to curtail known problems with gang control over HCCF and CoreCivic's other facilities.

97.     Cumulatively or in the alternative, CoreCivic implements facially unconstitutional policies, *de facto* policies, or customs that directly and proximately led to the attacks on Plaintiff and the failure to provide Plaintiff medical care.

98.     In the alternative, CoreCivic acted with deliberate indifference, failed to properly train and/or supervise their subordinates with respect to their responsibilities in ensuring that they provide a safe environment and reasonable medical care, which proximately caused the above-described constitutional rights violations.

## COUNT 2 – VIOLATION OF 42 U.S.C. § 1983 (AGAINST DEFENDANT PERRY IN HIS INDIVIDUAL AND OFFICAL CAPACITIES)

99.     Plaintiff incorporates paragraphs 1 through 92 as if fully set forth in this Count.

100.     As alleged above Warden Perry acting under color of state law, violated the rights of Plaintiff secured by the Eighth and Fourteenth Amendments of the U.S. Constitution.

101.     Defendant Perry was, at all times material to this cause, the warden of HCCF. Defendant Perry either established policies or well-established customs or knowingly acquiesced in the establishment of policies or well-established customs that were the direct and proximate cause of Plaintiff's deprivation of his constitutional rights. As a result, Defendant Perry is personally liable under Section 1983.  *Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 81 (6th Cir. 1995)("At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate") quoting, *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1983).

## COUNT 3 – VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT MCKINNIE

102.     Plaintiff incorporates paragraphs 1 through 92 as if fully set forth in this Count.

103.    At all times relevant to this Complaint, Defendant McKinnie acted under color of state law and within the scope of their employment with CoreCivic at HCCF.

104.    Defendant McKinnie acted with deliberate indifference, directly participated in and proximately caused the above-described constitutional rights violations by deliberately ignoring Plaintiff's pleas to afford him humane jail conditions, including but not limited to reasonable measures to ensure his safety, consistent with the requirements of the Eighth Amendment.

105.    Defendant McKinnie was on notice that Plaintiff was in danger and subsequently was assaulted four times while under the care of HCCF yet acted in a manner deliberately indifferent to Plaintiff's Eighth Amendment rights thereby causing him serious injury.

106.    Defendant McKinnie's actions described herein constitute deliberate indifference to Plaintiff's health and safety for which he has suffered damages.

**COUNT 4 – VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT LOUDEN**

107.    Plaintiff incorporates paragraphs 1 through 92 as if fully set forth in this Count.

108.    At all times relevant to this Complaint, Defendant Louden acted under color of state law and within the scope of their employment with CoreCivic at HCCF.

109.    Defendant Louden acted with deliberate indifference, directly participated in and proximately caused the above-described constitutional rights violations by deliberately ignoring Plaintiff's pleas to afford him humane jail conditions, including but not limited to necessary medical care, consistent with the requirements of the Eighth Amendment.

110.    Defendant Louden was on notice that Plaintiff was in danger and subsequently was assaulted four times while under the care of HCCF yet acted in a manner deliberately indifferent to Plaintiff's Eighth Amendment rights thereby causing him serious injury.

32

111.    Defendant Louden's actions described herein constitute deliberate indifference to Plaintiff's health and safety for which he has suffered damages.

## COUNT 5 – VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT WOODS

112.    Plaintiff incorporates paragraphs 1 through 92 as if fully set forth in this Count.

113.    At all times relevant to this Complaint, Defendant Woods acted under color of state law and within the scope of their employment with CoreCivic at HCCF.

114.    Defendant Woods acted with deliberate indifference, directly participated in and proximately caused the above-described constitutional rights violations by deliberately ignoring Plaintiff's pleas to afford him humane jail conditions, including but not limited to taking reasonable measures to ensure Plaintiff's safety and his serious need for medical treatment, consistent with the requirements of the Eighth Amendment.

115.    Defendant Woods was on notice that Plaintiff was in danger and subsequently was assaulted four times while under the care of HCCF yet acted in a manner deliberately indifferent to Plaintiff's Eighth Amendment rights thereby causing him serious injury.

116.    Defendant Woods actions described herein constitute deliberate indifference to Plaintiff's health and safety for which he has suffered damages.

## COUNT 6 – VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT MALONE

117.    Plaintiff incorporates paragraphs 1 through 63 as if fully set forth in this Count.

118.    At all times relevant to this Complaint, Defendant Malone acted under color of state law and within the scope of their employment with CoreCivic at HCCF.

119.    Defendant Malone acted with deliberate indifference, directly participated in and proximately caused the above-described constitutional rights violations by deliberately ignoring Plaintiff's pleas to afford him humane jail conditions, including but not limited to, taking

reasonable measures to ensure Plaintiff's safety, consistent with the requirements of the Eighth Amendment.

120.    Defendant Malone was on notice that Plaintiff was in danger and subsequently was assaulted four times while under the care of HCCF yet acted in a manner deliberately indifferent to Plaintiff's Eighth Amendment rights thereby causing him serious injury.

121.    Defendant Malone actions described herein constitute deliberate indifference to Plaintiff's health and safety for which he has suffered damages.

## COUNT 7 – NEGLIGENCE & NEGLIGENCE *PER SE* AGAINST DEFENDANT PERRY AND CORECIVIC

122.    Plaintiff incorporates paragraphs 1 through 92 as if fully set forth in this Count.

123.    Under Tennessee law, there are five distinct elements that must be established in any negligence claim.  The elements of negligence include (1) a duty of care owed by the defendant to plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause.

124.    It is clearly established under Tennessee law that prison officials owe a duty of care to the inmates in their custody.  *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008) (citing Restatement (Second) of Torts § 314A).

125.    Tenn. Code Ann. § 41-1-104(b) establishes a statutory obligation for the maintenance of policies and procedures and places that obligation upon the warden, in this case, Defendant Perry. "The custody, welfare, conduct, and safekeeping of the inmates shall be the responsibility of the warden, who will examine into the affairs of the institution daily to assure that proper standards are maintained." Tenn. Code Ann. §41-1-104(b).

34

126.     TDOC Policy 506.14(VI)(E) &(F) reads as follows:

E. General population units/pods with a capacity to house 64 or more inmates who are medium or high security shall supervise in accordance with Policy #5046.01, and shall adhere to the Tier Management Supervision model at all times.  Inmates shall be allowed out of their cells for dayroom activities by tier/walk as determined by the institutional policy; **however, inmates housed on the upper and lower tier/walk shall not be allowed out of their cells for pod/dayroom activities at the same time.** (emphasis added)

F. Each Waden shall promulgate the necessary institutional policy and procedures governing housing arrangements for inmates in accordance with this policy and incorporating the Tier Management Supervision for his/her facility.

127.     TDOC Policy therefore mandates the implementation of the Tier Management Supervision model, and implementation of the Tier Management model and compliance with TDOC policy is the standard of care for management of a prison in Tennessee.

128.     At all times material to this cause, Defendant Perry was acting within the scope of his employment as an employee and agent of CoreCivic. Therefore, CoreCivic is responsible for Defendant Perry's negligent conduct as the warden of HCCF.

129.     As described above, Defendant Perry and CoreCivic maintained policies of understaffing, failing to implement the Tier Management Supervision Model, failing to implement policies to properly segregate inmates to reasonably ensure inmate safety, and failing to implement policies to ensure that the serious medical needs of inmates were met.

130.     CoreCivic, both individually and through Defendant Perry's statutory and regulatory obligations, owed its inmates a duty of care to establish policies and procedures reasonably calculated to ensure their reasonable safety and access to healthcare for serious medical needs.

131.     CoreCivic actively established policies or well-established customs of understaffing and failing to provide for the serious medical needs of prisoners nationally and at HCCF and failed to adequately implement the Tier Management Supervision model as required

by TDOC policy.

132.   Plaintiff's injuries have already been identified in the incorporated paragraphs, and CoreCivic and Defendant Perry's breach of the statutory and regulatory obligations described in this count are the direct and proximate cause of those injuries.

## COUNT 8 – TENNESSEE COMMON LAW NEGLIGENCE AGAINST DEFENDANT PERRY AND CORECIVIC

133.   Plaintiff incorporates paragraphs 1 through 92 as if fully set forth in this Count.

134.   Defendants Perry and CoreCivic owed a legal duty of care to Plaintiff to protect him from reasonably foreseeable harm.

135.   Because gang violence is known to pose substantial risk to inmates, Defendants Perry and CoreCivic knew of or had reasons to anticipate that gang violence would cause inmates, such as Plaintiff, harm, but they did not use reasonable care to prevent it.

136.   Accordingly, Defendants Perry and CoreCivic knew of or should have known that Plaintiff would become the victim of gang violence, but they failed to use reasonable care to prevent it.

137.   Defendants Perry's and CoreCivic's breaches of their duty of care to Plaintiff proximately caused Plaintiff's injuries because of either acts or acts of omission on the part of Defendants Perry and CoreCivic.

138.   The breach of duty of care constitutes an act of negligence on the part of Defendants Perry and CoreCivic.

139.   As a direct and proximate result of Defendants Perry and CoreCivic's negligence, Plaintiff was damaged and nearly killed on multiple occasions

## COUNT 9 – NEGLIGENCE AGAINST CORECIVIC ARISING FROM VICARIOUS LIABILITY FOR THE ACTS OF DEFENDANTS MCKINNIE, LOUDEN, WOODS, AND MALONE

140.   Plaintiff incorporates paragraphs 1 through 92 as if fully set forth in this Count.

141.   Under Tennessee law, there are five distinct elements that must be established in any negligence claim.   The elements of negligence include (1) a duty of care owed by the defendant to plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or legal cause.

142.   It is clearly established under Tennessee law that prison officials owe a duty of care to the inmates in their custody.   *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 820 (Tenn. 2008) (citing Restatement (Second) of Torts § 314A); Tenn. Code Ann. § 41-1-104(b) ("The custody, welfare, conduct, and safekeeping of the inmates shall bet the responsibility of the warden, who will examine into the affairs of the institution daily to assure that proper standards are maintained.").

143.   Prison officials are not, however, "insurers" of each prisoner's safety."   *King v. Anderson Cnty.*, 419 S.W.3d 232, 248 (Tenn. 2013); *Jackson v. United States*, 24 F. Supp. 2d 823, 833 (W.D. Tenn. 1998) (citing *Cockrum v. State of Tenn.*, 843 S.W.3D 433, 437 (Tenn Ct. App. 1992)).   "Vigilance" on the part of prison officials is required, not "prescience," and "[t]he critical factor in distinguishing between vigilance and prescience is foreseeability, the third element in the proximate cause analysis."   *King*, 419 S.W.3d at 248.   This means "to establish proximate causation necessary to prevail in a negligence action against a penal institution for an inmate-on-inmate assault, the intuition must have had prior notice of an attack." *Id.*   Notice of this kind can either be actual or constructive. *Id.*

144.    CoreCivic received actual notice from Plaintiff that a threat was imminent not once, but twice before major assaults.  Furthermore, Defendants had constructive notice that subsequent attacks would occur by the same gang after the first assault on March 4, 2016.  At all times, Plaintiff informed CoreCivic's agents and employees of his fear of repeat assaults, even going so far as to accept disciplinary action to prevent himself from being placed in general population. Therefore, CoreCivic breached its duty of care regarding safekeeping.

145.    CoreCivic, through its agents and employees, received actual notice from Plaintiff that he was in need of serious medical treatment, on no less than twenty (20) occasions, to include but not limited to, loss of hearing, loss of vision, infections, and problems with memory due to his diagnosed traumatic brain injury.  Furthermore, CoreCivic, through its agents and employees, was on constructive notice that Plaintiff needed advanced, continuing medical treatment because he had recently been subject to a brutal assault, which left him with a traumatic brain injury and multiple fractures.  Therefore, CoreCivic breached its duty of care regarding welfare.[9]

146.    Defendant CoreCivic is responsible for the acts and omissions of its employees and agents while acting within the scope of their employment. CoreCivic is therefore responsible for the negligent acts of all individual Defendants.

147.    Plaintiff's injuries have already been identified in the incorporated paragraphs, all of which arose as a direct and proximate cause of the negligence of CoreCivic through its policies, agents, and employees.

---

[9] Plaintiff does not assert a claim for healthcare liability against CoreCivic. Rather Plaintiff alleges that his injuries were the direct and proximate result of HCCF staff failing to even give him access to medical professionals. CoreCivic, when acting in its role as a private prison operator, is not itself a "Healthcare Provider" subject to the protections of the Healthcare Liability Act.

**COUNT 9 – GROSS NEGLIGENCE AGAINST ALL DEFENDANTS**

148.   Plaintiff incorporates paragraphs 1 through 92 as if fully set forth in this Count.

149.   Three conditions plaintiffs can use to establish the present of gross negligence are as follows: (1) such entire want of care as would raise a presumption of conscious indifference to consequences, or (2) a heedless and reckless disregard for another's rights, or (3) utter unconcern for the safety of others.  *Gross v. Nashville Gas. Co.*, 608 S.W.2d 860 (Tenn. Ct. App. 1980).

150.   If the court finds there both deliberate indifference and negligence under Tennessee law, there must also be gross negligence.

**VII.**
**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff demands judgment against Defendants on each Count of the Complaint and pray for the following relief:

1.   Issue service of process and serve the Defendants;

2.   Permit Plaintiff leave to amend this Complaint after reasonable discovery;

3.   Empanel a jury to try this matter;

4.   Award Plaintiff compensatory damages in an amount of not less than $3,000,000;

5.   Award Plaintiff punitive damages against all Defendants;

6.   Award Plaintiff his reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

7.   Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

8.   Award pre-and post-judgment interest pursuant to TENN. CODE ANN. § 47-14-123 in amount according to the proof at trial; and

9.   Grant Plaintiff such further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Brice M. Timmons*
Brice M. Timmons (#29582)
Craig Edgington (#38205)
DONATI LAW, PLLC
1545 Union Avenue
Memphis, TN 38104
(901) 278-1004 (Phone)
(901) 278-3111 (Fax)
brice@donatilaw.com
craig@donatilaw.com

William E. Cochran, Jr. (#21428)
Charles S. Mitchell (#23789)
BLACK MCLAREN JONES RYLAND
   & GRIFFEE PC
530 Oak Court Drive, Suite 360
Memphis, TN  38117
(901) 762-0535 (Phone)
(901) 762-0539 (Fax)
wcochran@blackmclaw.com
cmitchell@blackmclaw.com