IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

---

**ADRIAN DESHUN DELK**

                 **Plaintiff,**

v.                                                  Case 1:22-cv-02540-JDB-cgc

**CORECIVIC, d/b/a "HARDEMAN COUNTY
CORRECTIONAL FACILITY,"
COLUMBUS MALONE,
WARDEN GRADY PERRY,
DANITA WOODS, LATOYA LOUDEN,
and TOMICKA McKINNIE,**

                 **Defendants.**

---

### ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE
### THE TESTIMONY OF TIM GRAVETTE

---

Before the Court is Defendants CoreCivic, Inc. ("CoreCivic"), Warden Grady Perry ("Perry"), Columbus Malone ("Malone"), Danita Woods ("Woods"), Latoya Louden ("Louden"), and Tomicka McKinnie's ("McKinnie") (collectively "Defendants"), *Daubert* Motion to Exclude Plaintiff's Proposed Expert Testimony ("Motion to Exclude") (Docket Entry ("D.E.") # 31). The instant motion was referred to the United States Magistrate Judge for determination. (D.E. #33). For the reasons set forth herein, Defendants' Motion to Exclude is GRANTED.

### I. Background

#### a. *Plaintiff's Complaint*

This case arises from Plaintiff's injuries sustained from multiple alleged assaults by fellow inmates while incarcerated at Hardeman County Correctional Facility ("HCCF"), which is owned

and operated by CoreCivic. Plaintiff alleges that CoreCivic and Perry, in his individual and official capacities, violated 42 U.S.C. § 1983 ("Section 1983") by depriving Plaintiff of his rights secured by the Eighth and Fourteenth Amendments of the United States Constitution. (Compl. ¶¶ 94-101). The Section 1983 claim against CoreCivic alleges "deliberate and systematic" understaffing of HCCF, "deliberate and/or reckless" failure to implement the Tier Management Supervision Model, and failure to implement policies and procedures designed to curtail gang control issues. (*Id.* ¶ 96). The claim against Perry alleges that he either established policies or well-established customs or knowingly acquiesced in the establishment of policies or well-established customs that were the direct and proximate cause of the deprivation of Plaintiff's constitutional rights. (*Id.* ¶ 101). Additionally, Plaintiff alleges that McKinnie, Louden, Woods, and Malone Violated Section 1983 by acting with deliberate indifference to Plaintiff's safety. (Compl. ¶¶ 102-121).

Along with his Section 1983 claims, Plaintiff has brought the following state-law claims: claims for negligence, negligence per se, and Tennessee Common Law Negligence against Perry and CoreCivic; and, a claim of negligence against CoreCivic based upon vicarious liability for the acts of McKinnie, Louden, Woods, and Malone; and, claims of gross negligence against all parties. (Compl. ¶¶ 122-150).

    b. ***Gravette Expert Report***

Plaintiff seeks to rely upon the expert testimony of Tim Gravette ("Gravette"). Gravette's expert report sets forth his qualification as a twenty-year corrections veteran. (D.E. #31-2 at PageID 235-36 & Exh. A). Over the course of his career, Gravette has served as a Correctional Officer, Lieutenant, Captain, and Associate Warden with the Federal Bureau of Prisons. (*Id.* at PageID 235). In these roles, he has had a variety of duties, from "direct supervision of the inmate population" in their "assigned units, work assignments[,] and leisure time activities" to managing

correctional officers' "daily duties and all other aspects of the safety, security, and orderly running of the facility." (*Id.*)

While serving as Associate Warden, Gravette "wrote and critiqued local policy and made decisions which affected the safety, security, and orderly running of the facility . . . ." (*Id.* at PageID 236). These policies were written based upon the "principles of sound and proven correctional management, Federal law and standards provided by the American Correctional Association (ACA)." (*Id.*) Additionally, Gravette has served as an instructor for correctional staff, and he has commanded and participated in "incidents of emergency response for medical emergencies, inmate disturbance, hostage situations, assaults, suicides, homicides, and attempted escapes." (*Id.*) Gravette has testified as an expert at four federal trials and has testified at numerous depositions. (*Id.* at PageID 243-44).

Gravette's report states that his opinions are based upon his review of available material as well as his experience, training, and knowledge of the practices that should be standard in all corrections facilities. (*Id.* at PageID 236 & Exh. B). Specifically, Gravette states that his applicable experience and training pertain to "inmate culture, correctional investigative practices, sound correctional management, proper correctional environmental practices, inmate management and correctional administration experience." (*Id.*)

Gravette then stated that he has reviewed 186 lawsuits in relation to this case, thirty-five of which are based upon failure-to-protect claims. (*Id.* at PageID 240). Gravette stated that, based on that information, "it is more probable than not [that] the allegations presented in the case material . . . have merit" and that, in his opinion, "the CoreCivic staff at HCCF failed to protect [Plaintiff] from his assailants." (*Id.*)

Gravette's report recounts the factual information relating to four assaults that Plaintiff suffered while incarcerated at HCCF. (*Id*. at PageID 236-240). These assaults occurred on the following dates: March 4, 2016 ("Assault 1"); June 9, 2016 ("Assault 2"); November 4, 2017 ("Assault 3"); and, January 18, 2018 ("Assault 4"). (*Id*.) As context for his discussion of these incidents, Gravette opined that, based upon his training and experience, "[p]rison gangs use various methods to extort and victimize non-affiliated inmates[,] with assault and intimidation being the most prevalent of their tactics." (*Id*. at PageID 236).

With respect to Assault 1, which occurred after Plaintiff had requested a cell change "many times" due to "problems with his cell mate who was a gang member," Gravette provided the following opinion regarding whether an inmate's cell-change requests should be granted:

> Based on my experience[,] when an inmate requests a cell change for legitimate reasons[,] a staff member is obligated to take some action to resolve the request and to simply deny the request is not what I would expect of a case manager who has the responsibility for inmate safety as part of their daily duties. This level of indifference to such requests needlessly places an inmate[']s safety at risk. Failure to promptly respond to an inmate[']s . . . requests for cell changes or protective custody . . . indicates training . . . or cultural problems within the facility.

(*Id*. at PageID 238).

With respect to Assault 1, Gravette also opined that HCCF violated its tier management policy, which provides that inmates may be released from their cells during the day by tier or "walk" but that no more than one tier or walk should be allowed out of their cells at the same time. (*Id*.) Gravette stated that "[p]olicies and procedures are in place to maintain a safe and secure environment for the staff and the inmates" and that, "when both tiers are open and the inmates are out of their cells for a period of time as described in the case information[,] it is more probable than not that there is a custom or practice at the HCCF that the Tier Management Supervision model is often violated by the correctional staff." (*Id*.) Gravette stated that, based upon his

4

experience, "when inmates are out of their cells[,] other correctional staff assigned to the area would have taken notice" and, "[i]f it were not a custom and practice to violate the Tier Management Supervision model[,] this practice would have been stopped by other correctional staff in the area." (*Id*.)  As to Woods specifically, Gravette opined that her actions were a "blatant violation" of the tier management policy that were "unacceptable and reckless" and demonstrate an indifference to the safety of the inmate population and fellow officers. (*Id*. at PageID 237-38).

With respect to Assault 2, which Plaintiff apparently did not report, Gravette opined that "it is not uncommon for an inmate to be reluctant to report an assault to staff" because, "[i]f word gets out among the gang [that Plaintiff] . . . has been in contact with a staff member to report the assault and he is still in the pod area[,] it is probable [that] he will be assaulted again or even murdered." (*Id*. at PageID 239).

With respect to Assault 3, which also occurred after Plaintiff and another inmate had reportedly expressed to jail staff that the same inmate who did in fact stab him a day or two later had threated his life, Gravette opined that three staff members—Case Manager Allen, Sergeant Redman, and Lieutenant Thomas[1]—did nothing to move Plaintiff into another cell or otherwise protect him. (*Id*.)  Gravette stated that this type of behavior and lack of action or inquiry into what was going on showed in indifference to Plaintiff's safety and wellbeing. (*Id*.)

With respect to Assault 4, which occurred after Plaintiff requested not to be transferred out of "SEG" because he feared for his life, Gravette opined that, based upon his experience as a SEG Officer, SEG Lieutenant, and Captain who was responsible for SEG operations at numerous prisons, Plaintiff was trying to convey to Officer Carlson[2] that he should remain in SEG where he

---

[1] These individuals are not named defendants in the instant action.

[2] This individual is not a named defendant in the instant action.

would be isolated from the inmates in general population.  (*Id*. at PageID 240).  Gravette again stated that "[p]rotection of inmates is a custom and practice in the corrections industry and [is] the responsibility of all staff members."  (*Id*.)  He also again stated that "[f]ailure to move an inmate out of harm's way is a failure to protect the inmate."  (*Id*.)

Gravette additionally provided his opinions regarding staffing levels at HCCF.  Gravette stated that "[p]roper staffing levels for security staff are critical to the mission of correctional facilities."  (*Id*.)  He stated that the Front Entrance and Perimeter Patrol are "critical positions" and that, "[w]hen you do not have the proper number of staff manning those critical positions[,] it weakens the security operation and creates opportunity for the introduction of contraband and unauthorized persons gaining access to the secure perimeter area."  (*Id*. at PageID 240-41)

Specifically, Gravette opined as follows with respect to staffing:

> The important part of staffing is to know which posts can be vacated and which ones you cannot vacate.  Critical posts should never be vacated unless there is an extreme emergency[,] and I have found no evidence in the monitor[']s report which would indicate there was any type of emergency during those periods of time.  The failure to maintain proper staffing levels in a facility hinders the ability of staff to do their assigned job.  When staff are not doing their assigned job, it is more likely [that] certain aspects of inmate care could be neglected.  One of those areas could result in an inmate being housed in an area of the facility that puts his life in danger or the lives of others.

(*Id*. at PageID 241).  Gravette also provided that "assigning one staff member to multiple roster positions creates a vacancy in one position even though the staff roster indicates there is a staff member working in that position."  (*Id*.)  Gravette opined that CoreCivic's staffing practices "illustrate a lack of customary oversight by key supervisory staff."  (*Id*.)

Gravette's report concludes with a summarization of what he titles as his "Present Opinions."  (*Id*.)  These include as follows:

6

- "The failure of the staff to take action when [Plaintiff] made these requests [for safe housing] indicates an atmosphere of indifference to the safety and security of the inmates in their care." (*Id*.)

- "Defendants in this case recklessly violated established correctional customs, standards of care, and practices in their treatment of" Plaintiff. (*Id*.)

- Plaintiff's "requests and the requests by fellow inmates to have him moved into another cell were ignored by staff including unit management staff and correctional/security staff." (*Id*. at PageID 241-42).

- "Had the staff taken appropriate action to determine if [Plaintiff's] requests were legitimate[,] they could have taken steps to remove him from the area and possibly avoid[] the assaults he was subjected to at the HCCF at the hands of known gang members." (*Id*. at PageID 242).

- HCCF "recklessly failed to follow sound correctional standards of are and customs and practices in relation to the safe keeping of [Plaintiff] by not removing him from a dangerous area where he was housed in a cell with known gang members." (*Id*.)

- "The facility staff who were named in this proceeding had an obligation to provide a safe and humane environment for all the inmates who were in their correctional facility[,] including [Plaintiff,] and they failed to do so. (*Id*.)

  c.  ***Gravette's Supplemental Report***

In addition to his original report, Gravette prepared a Rebuttal/Supplemental Expert Report. (D.E. #31-3). Therein, Gravette provided his findings after a review of the expert report of Dr. John G. Peters ("Dr. Peters"). (*Id*. at PageID 252-255). Gravette summarized four specific opinions of Dr. Peters with which he disagreed. (*Id*.)

First, Gravette states that Dr. Peters opined that CoreCivic and Perry "met and/or exceeded national correctional standards, recommendations, and/or guidelines for the development of policies and procedures for their facilities." (*Id*. at PageID 252-53). Gravette opined that "[t]his case is not about the ability of an agency or a warden to provide a written set of policy and procedure to correctional staff" but instead "is about the customs, practices, or actual implemented

7

policies . . . that deprived Plaintiff of his constitutional rights including, but not limited to, their deliberate and systematic understaffing, failures to implement policies and practices to curtail the known problem of gang control, deliberate practice or custom failing to abide by the Tier Management Supervision model, and their failure to properly train and/or supervise subordinates." (*Id*. at PageID 252).

Second, Gravette states that Dr. Peters opined that he was not critical of Plaintiff's "minimum restricted" classification as evidenced by the lack of discussion of that issue in his expert report. (*Id*. at PageID 253). Gravette responds that the issue in the case is not that Plaintiff received the wrong inmate classification but that he reported safety concerns to HCCF staff that were not properly addressed. (*Id*.)

Third, Gravette states that Dr. Peters opined that HCCF was reviewed and found to be in compliance with the Tier Management Policy. (*Id*.) Gravette responds that his expert report states that, on the day of Assault 1, HCCF was not being followed and that substantial testimony from both inmates and corrections officers shows that HCCF was frequently not in compliance. (*Id*.)

Fourth, Gravette states that Dr. Peters opined that Plaintiff failed to request to change cells in the proper manner and failed to request protection via protection policy guidelines. (*Id*. at PageID 255) Gravette opined that, based upon his training and experience, it is common practice that corrections officers should ensure inmate safety no matter how they become aware of a concern. (*Id*.) He further opined that there is a factual dispute regarding whether an inmate could request a cell change verbally. (*Id*.)

### d. Motion to Exclude

On April 4, 2023, Defendants' filed the instant Motion to Exclude. Defendants argue that Gravette should not be permitted to testify as an expert because he does not apply principles or methods that the Court can deem as reliable.

On May 5, 2023, Plaintiff filed his Response. (D.E. #34). Therein, he argues that Gravette is eminently qualified to render opinions on corrections. He further argues that documents in an earlier lawsuit show that he generally relies on the standards provided by the American Correctional Association and other Performance Based National Detention Standards in forming his opinions. Finally, he argues that Gravette's opinions were formulated after reviewing nearly 8,000 pages of documents pertaining to the case.

## II. Analysis

### A. Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b) The testimony is based on sufficient facts or data;
>
> c) The testimony is the product of reliable principles and methods; and
>
> d) The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 requires "more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993). While expert testimony is often scientific, experts may be permitted to testify based upon experience alone or experience in conjunction with other knowledge, skill, training, or education. *Starnes v. Sears Roebuck & Co.*, No. 01-2804 B AN, 2005 WL 3434637 (W.D. Tenn. Dec. 14, 2005) (citing Fed. R. Evid. 702 Advisory Committee's. Notes).

"In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." *Id*. However, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id*. "The trial court's gatekeeping function requires more than simply 'taking their word for it.'" *Id*.

"'The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.'" *Kush Enters., LLC v. Mass. Bay Ins. Co.*, No. 3:18-CV-492, 2021 WL 3007263, at 6 (E.D. Tenn. July 17, 2021) (quoting *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529-30 (6th Cir. 2008)).

In *Starnes*, Plaintiff's case arose from injuries she sustained from an assault in a shopping mall parking lot. *Id*. at *1. Plaintiff asserted that Defendants were responsible because they did not provide adequate security measures. *Id*. Plaintiff sought to have a veteran law enforcement officer as an expert witness. *Id.* at *2. Plaintiff's proposed expert had thirty years of experience with the United States Secret Service ("USSS"), including fifteen as the Special Agent in Charge of the Memphis, Tennessee field office. *Id*. For the eleven years prior to Plaintiff's case,

10

Plaintiff's proposed expert acted as President of a security consulting and investigative firm, which focused on areas such as security of facilities and operations. *Id*. Plaintiff's proposed expert visited the site of the incident and reviewed mall incident reports, depositions, a daily activity safety report of the incident date, the security company's employee handbook, and the police incident and crime analysis reports. *Id*.

The *Starnes* Court determined that Plaintiff's proposed expert "possesse[d] specialized knowledge concerning security beyond that of the average person" and thus was qualified to opine as to the sufficiency of security at the shopping mall. *Id*. at \*3 (citing cases). However, the Court continued to find that Plaintiff's proposed expert's opinions were not reliable or relevant because he offered "no basis, other than his experience, for his opinions" for the Court to assess the methodology and principles that guided him. *Id*. at \*4 (citing *Bethea v. Bristol Lodge Corp.*, No. Civ.A. 01-612, 2003 WL 21146146 (E.D. Pa. May 19, 2003)) (finding the proposed expert testimony of a law enforcement officer who ran a security firm to be inadmissible because, even though he possessed specialized knowledge beyond the average layman in the area of security for commercial properties, he had not set forth any methodology, such as industry standards, that the Court could determine is reliable).

Plaintiff's proposed expert testimony from Gravette is highly analogous to the proposed expert testimony in *Starnes* and *Bethea*. From Gravette's report, it can easily be said that he has specialized knowledge in the field of corrections, including the operation of corrections facilities and inmate safety. It can additionally be said that he has reviewed extensive documentation pertaining to Defendants' policies and procedures as well as to the assaults upon Plaintiff. Critically, however, his report does not set forth the principles or methodology that guided him to his conclusions. It is this process which the Court must find to be reliable under Rule 702 for

expert testimony to be permitted. Absent evidence for the Court to test the expert opinion's reliability, the expert's opinion must be excluded. Thus, the Court finds that Gravette may not be permitted to testify as an expert witness in this matter.

### III.  Conclusion

For the reasons set forth herein, Defendant's Motion to Exclude the Testimony of Tim Gravette is GRANTED.

IT IS SO ORDERED this 20th day of July, 2023.

                                                s/ Charmiane G. Claxton  
                                                CHARMIANE G. CLAXTON  
                                                UNITED STATES MAGISTRATE JUDGE